IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

BALTAZAR'S STONE V. PAPE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

BALTAZAR'S STONE, INC., A NEBRASKA CORPORATION, APPELLEE,

V.

STANLEY L. PAPE AND PAMELA A. PAPE, APPELLANTS.

Filed April 22, 2025.    No. A-24-516.

Appeal from the District Court for Dawson County, MICHAEL E. PICCOLO, Judge, on appeal thereto from the County Court for Dawson County, JEFFREY M. WIGHTMAN, Judge. Judgment of District Court affirmed.

Siegfried H. Brauer, of Brauer Law Office, for appellants.

Brian W. Copley, of Heldt, McKeone & Copley, for appellee.

MOORE, PIRTLE, and WELCH, Judges.

MOORE, Judge.

### I. INTRODUCTION

Stanley L. and Pamela A. Pape appeal from the order of the district court for Dawson County affirming the county court's judgment in favor of Baltazar's Stone, Inc., a Nebraska corporation. We affirm.

### II. STATEMENT OF FACTS

Baltazar's Stone entered into a contract with the Papes for necessary labor and material for the installation of stone at the Papes' residence. The Pape project involved both exterior and interior stone, including a hearth and mantel. The total amount billed by Baltazar's Stone to the Papes was approximately $57,000, the majority of which was paid. This case arises out of Baltazar's Stone's demand for the remaining amount allegedly owed by the Papes.

- 1 -

On May 9, 2022, Baltazar's Stone filed a complaint in Dawson County Court alleging that Baltazar's Stone had been hired by the Papes for residential stonework in June 2021. The complaint alleged that Baltazar's Stone had fully performed pursuant to the terms of its contract with the Papes or was otherwise excused from such performance, while the Papes had failed to fully perform their obligations under the contract with Baltazar's Stone. Specifically, the complaint alleged that the Papes had failed to pay Baltazar's Stone for work performed under the contract and set forth three alternative causes of action, including breach of contract, suit on account, and quantum meruit and unjust enrichment. The complaint requested damages in the amount of $17,300.85, as well as prejudgment and postjudgment interest as allowed by statute.

On June 30, 2022, the Papes filed an answer and counterclaim that denied the allegations in the complaint, and further asserted that Baltazar's Stone's claim was "frivolous and in bad faith subjecting it to Papes' legal fees and expenses under Neb. Rev. Stat. §§ 824 [sic] and following." The answer also asserted three "affirmative defenses" including failure to state a cause of action; full payment of all amounts due; and accord and satisfaction. The counterclaim sought damages of $2,700 and $2,003 for deficient performance related to the installation of the mantel and hearth, respectively. The counterclaim also alleged that Baltazar's Stone had failed to reduce its claim by the value of excess materials the company had left on the Papes' property.

The Papes later filed a motion to amend its answer and counterclaim to include attorney's fees related to a construction lien filed against the Papes by Baltazar's Stone. The Papes filed an amended answer and counterclaim which added a request for $2,175 for attorney's fees related the lien.

A trial on the matter was held over the course of 2 days in February and March 2023. The following evidence relevant to the Papes' assignments of errors was adduced. Additional evidence will be set forth as necessary in the analysis section below.

1. CREDIT CARD PAYMENTS AND CHARGEBACKS

Melissa Stromgren, general manager for Baltazar's Stone, testified that at the start of the Pape project, Pamela indicated that she would pay with a Discover credit card and the card was then put on file. Stromgren confirmed that Pamela had authorized that the credit card be used to pay the Papes' account balances at Stromgren's discretion. However, Stromgren had a courtesy practice of contacting the Papes after an invoice had been sent to obtain consent to charge the credit card.

Stromgren testified that she sent various estimates to the Papes because the scope of their project changed several times in terms of the size, materials, and need for labor. Copies of the estimates, sales orders, and invoices related to the work completed on the Pape project were entered into evidence. Stromgren's notations at the top of the estimates reflect when the estimates were accepted by the Papes. The Papes testified that Baltazar's Stone sent multiple inconsistent and confusing invoices. Stromgren testified that she never heard from the Papes regarding any invoice inaccuracies.

However, after an invoice had been sent to the Papes for installation of the hearth and mantel, Stromgren learned that the Papes objected to the work that had been completed by Baltazar's Stone. Stromgren testified that the Papes refused to pay their final invoice in full and that Baltazar's Stone had issues collecting payment from them.

Baltazar Sauceda, the owner of Baltazar's Stone, testified that he had a conversation with the Papes about charging their credit card for $17,300.85, the amount owed on their final invoice. Sauceda and the Papes agreed that the card would be processed in separate transactions to avoid incurring a credit card fee. Credit card transaction data entered into evidence reflects that the Papes credit card was charged $9,900 by Baltazar's Stone on August 13, 2021, and $5,000 on August 25.

Pamela testified that she did not authorize the charges of $9,900 or $5,000 and that on August 31, 2021, she requested a "chargeback" from her credit card company in order to stop the payment for both transactions. Pamela stated that the reason she stopped both payments was because there were several issues with the project that she believed needed to be addressed by Baltazar's Stone, including excess stone that had been brought to the property, the incorrect color of mortar around the fireplace, and various mortar cleanup projects.

Pamela stated that up until September of 2021, she repeatedly attempted to obtain final documentation from Baltazar's Stone to determine the remaining balance owed on the Papes' account. On September 14, a series of emails were exchanged between Pamela and Stromgren where Pamela disputed the final amount owed by the Papes. In response to Pamela's question regarding the value of the final balance, Stromgren responded, "Pam, I have a total of $75.85 balance owed after you release the claim you have for the $9900.00 and the $5000.00 from Discover."

Sauceda sent an email to the Papes on September 20, 2021. In the email he stated:

At this point, I want to let you know that we are done, we have the right to refuse to provide any other services to you, we are terminating this project, we will not persue [sic] anymore additional charges for materials or labor provided to you, but are no longer interested in working with you. The balance you owe to us we will simply write it off at this point.

Sauceda testified that when he wrote the September 20 email, he was unaware that any chargebacks initiated by Pamela had occurred. Sauceda's intention had been to write off the small remaining balance on the Papes' account and not to offer to waive the $14,900 in chargebacks. Sauceda testified that any offer to waive the Papes' outstanding balance had been made with the assumption that the $14,900 had already been paid to Baltazar's Stone.

In two letters to Baltazar's Stone dated October 11 and 13, 2021, the credit card company stated that the transitions of $9,900 and $5,000, respectively, had been charged back to the cardholder. The letters requested that Baltazar's Stone respond within 20 days "[t]o ensure your rights . . ." Sauceda testified that his receipt of the October letters was the first time that he became aware that the credit card chargebacks had been completed.

Upon receiving these letters, Sauceda immediately sent an email to Pamela demanding repayment of the $14,900 which had been charged back by the credit card company and notifying her that a construction lien would be placed on her property in the event of nonpayment. Sauceda also "vaguely" recalled receiving notice from the credit card company informing him of his ability to dispute the chargebacks prior to receiving the letters, but Sauceda was unable to recall the date of the notice. Sauceda affirmed that he had not been notified about any chargebacks at the time he had sent the September 20 email.

When Pamela was asked whether she gave Baltazar's Stone authorization to make payments upon discretion when she agreed to make payments by credit card, she responded that

the $9,900 charge was unauthorized. However, she later testified that she had indicated that Baltazar's Stone could "[c]harge the first $9,900, then let Stanley and I go over things," before she then stopped the payment "until we could have communication, and get some clarification."

## 2. EXCESS STONE

Sauceda testified that he personally measured the Papes' residence for the project. Sauceda approximated that 2,300 square feet of stone was installed in the residence and 2,500 was delivered to the property. Sauceda stated that when Baltazar's Stone prepares an estimate, the company adds an extra 5 to 10 percent of materials for "waste factor." In this case, the Papes were "very particular" regarding the specific color and style of stones that they wanted, so 8 to 10 percent of extra materials were added to Sauceda's measurements. Additionally, Sauceda wanted to make sure that the masons had sufficient stone on site as the Pape project was hours away from Baltazar's Stone.

Sauceda believed that the amount of stone left over at the conclusion of the Pape project was typical for a project of the same size. Sauceda and his employees testified that the Papes were not billed for any additional stone that was delivered, only the stone that was installed. Invoices entered into evidence reflect that the Papes were billed for approximately 2,245 total square feet of stone (1,790 square feet for exterior stone and 455 square feet for interior stone). Sauceda conceded that some additional stone may have been left at the worksite following the deterioration of the parties' professional relationship but reiterated that the Papes were not charged for any stone not installed.

A contractor, unrelated to Baltazar's Stone, who provided additional work for the Papes, testified that he measured the amount of stone laid in the entirety of the residence, which was 1,790 square feet. Pamela testified that four pallets of stone and some corner pieces were left on her property following the project.

## 3. MANTEL

Stanley and the employees of Baltazar's Stone testified consistently that the parties had agreed a particular method would be used to hang the mantel. Based on that agreement, Stanley had completed substantial work to prepare the area of the mantel's installation. Additionally, Stanley possessed the expertise to install the mantel himself.

At some point, Sauceda determined that the originally agreed upon hanging method would not adequately support the weight of the mantel. Out of safety concerns, he decided that a groove should be cut into the back of the mantel to facilitate an alternative method of hanging. The groove caused the originally agreed upon hanging method to be impossible. Sauceda also offered to come to the Papes' residence to install the mantel with no discussion as to the cost for such installation. Stanley testified that he was not present when the mantel was installed.

## 4. HEARTH

The Papes and Stromgren reached an agreement that the stone used for the hearth and mantel should include fossil-laden stone and have a rustic aesthetic. The sections of the hearthstone were stacked with Styrofoam dividers for delivery and subsequently left outside on the Papes' property for a day prior to installation. Josh Hajek, an employee of Baltazar's Stone, testified that

the Styrofoam had left spots on the hearthstone. Hajek and his team cleaned and rebuffed the hearthstone in an effort to make the stone look consistent. Stromgren was on site at the time the hearth was cleaned and observed that the buffing left "swirls" and streaks in the hearthstone.

On August 17, 2021, Pamela sent an email stating that she was pleased with the stonework on the fireplace and that she "love[d] the hearth and mantel . . ." At trial, Pamela testified that she was satisfied with the design of the hearth, but that Stromgren had promised that Baltazar's Stone would return and apply "the matte finish" selected by the Papes.

In an email to Stromgren on September 17, 2021, Pamela wrote "Hearth looks very streaked . . . is this the look you were looking for or does it need [sic] have streaks polished out of it." Stromgren responded that the hearth looked "normal and is still curing." She relayed that Sauceda had advised the streaks would dissipate within 6 months. The Papes offered photographs of the hearthstone taken in August 2021 and August 2022, which Pamela testified showed no difference in the appearance of the hearth. Pamela stated that at the time of trial, the hearth had "swirls and high shine," and its appearance was not as rugged as she would have liked. Stanley testified that at the time of trial, the hearth had not been replaced and that he and Pamela had not yet decided whether they would keep it in place. The contractor testified that he had not been asked to perform any corrective work on the hearth, though he suggested that a darker stain could address the streaking.

Hajek testified that photographs taken of the hearth and mantel show that the surface was consistent throughout the stonework. Stromgren testified that the hearth was in good condition and was the product ordered by the Papes. Stromgren noted that some streaking was typical of the natural stones used by Baltazar's Stone and that she believed the workmanship of the hearth was proper.

5. CONSTRUCTION LIEN

Hajek testified that he was tasked by Sauceda with placing a construction lien on the Papes' property after they had declined to remove the chargeback requests on the $14,900. Hajek had never before filed a construction lien, and he contacted the Dawson County Register of Deeds for assistance. The Register of Deeds subsequently emailed Hajek samples of construction liens and "a copy of the deed showing the legal description of the entire section where you are completing construction." Hajek used the legal description included in the deed that had been provided by the Register of Deeds in completing Baltazar's Stone construction lien. Hajek also noted that the mason who had worked on the Papes' property immediately prior to Baltazar's Stone had used the same legal description in their own construction lien. Hajek ultimately placed a construction lien on a tract of property that was owned by the Papes, but that tract did not contain the residence where Baltazar's Stone had completed its stonework. At the time Hajek filed the lien he was unaware that he had used the incorrect legal description for the Papes' real estate at issue.

It appears from the record there was a separate action in district court brought under the Nebraska Construction Lien Act to resolve the construction lien filed in error against the Papes. In that separate proceeding, the construction lien was discharged.

The Papes incurred legal fees to defend the improperly filed lien in the amount of $1,275. The Papes testified that a credit company had a deed of trust on the property on which the lien was filed. Due to a contract between the Papes and the credit company, the Papes were required to

reimburse litigation fees that were incurred in protecting the credit company's interest in the property. A letter from the credit company entered into evidence reflects that the Papes were billed $2,047 for the legal expenses of the credit company.

## 6. ORDERS

On June 28, 2023, the county court entered judgment in favor of Baltazar's Stone in the amount of $14,640.85, plus prejudgment interest at 12 percent in the amount of $3,137.82. Based on a totality of the evidence received at trial, the court found that the total of the labor and materials provided by Baltazar's Stone to the Papes, after credit for all payments made by the Papes, was $17,300.85. However, the county court reduced the judgment by $2,660 (the total cost for the installation of the mantel) after finding that Baltazar's Stone failed to show that the Papes had agreed to the alternative method of hanging the mantel. The court found that the Papes had failed to plead waiver, and that the evidence did not support the defenses of accord and satisfaction or waiver. The court found that the Papes were only entitled to a reduction of the judgment regarding Baltazar's Stone's failure to properly cut the mantel, but that their claims of deficient performance related to excess material, and the hearth failed. Finally, the county court denied the Papes' request for attorney's fees incurred in contesting the construction lien.

The district court affirmed the county court's order in its entirety in an order entered on July 4, 2024.

The Papes appeal.

## III. ASSIGNMENTS OF ERROR

The Papes assign, consolidated and restated, that the district court erred in affirming the county court's (1) finding that the evidence did not support the defenses of accord and satisfaction and waiver, and also that the Papes did not plead waiver, (2) denying the Papes' deficient performance and excess charges claims and failing to properly reduce the judgment accordingly; (3) assessing prejudgment interest when Baltazar's Stone attempted to impose a usurious interest rate; and (4) finding the Papes were not entitled to attorney's fees related to the lien foreclosure suit.

## IV. STANDARD OF REVIEW

The district court and higher appellate courts generally review appeals from the county court for error appearing on the record. *Schaefer Shapiro v. Ball*, 305 Neb. 669, 941 N.W.2d 755 (2020). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id*. However, in instances when an appellate court is required to review cases for error appearing on the record, questions of law are nonetheless reviewed de novo on the record. *Schmunk v. Aquatic Solutions*, 29 Neb. App. 940, 962 N.W.2d 581 (2021).

## V. ANALYSIS

### 1. AFFIRMATIVE DEFENSES

Matters which seek to avoid a valid contract are affirmative defenses. See *Linscott v. Shasteen*, 288 Neb. 276, 847 N.W.2d 283 (2014). An affirmative defense must be specifically pled

to be considered. *Id*. The key to determining the sufficiency of pleading an affirmative defense is whether it gives the plaintiff fair notice of the defense. *Id*. An affirmative defense not raised or litigated in the trial court cannot be urged for the first time on appeal. *Id*. The burden of both pleading and proving affirmative defenses is upon the defendants, and when they fail to do so, they cannot recover upon mere argument alone. See *Funk v. Lincoln-Lancaster Cty. Crime Stoppers*, 294 Neb. 715, 885 N.W.2d 1 (2016).

(a) Accord and Satisfaction

The Papes assert that the county court erred in finding the Papes failed to prove a meeting of the minds regarding the affirmative defense of accord and satisfaction. The Papes also assert that the district court erred in affirming the county court and in making various factual findings related to the credit card dispute.

To constitute an accord and satisfaction, there must be (1) a bona fide dispute between the parties, (2) substitute performance tendered in full satisfaction of the claim, and (3) acceptance of the tendered performance. *Zornes v. Zornes*, 292 Neb. 271, 872 N.W.2d 571 (2015). Whether Sauceda made concessions in his email sent on September 20, 2021, intending them to satisfy the Papes' claim to the chargeback amounts, is a question of fact. A meeting of the minds is essential, and therefore, there is no accord and satisfaction if one party is not yet aware of the later-disputed matter. See *id*.

The county court concluded that the Papes had failed to show that accord and satisfaction was satisfied because there had been no meeting of the minds. The county court found that there was "a substantial amount of ambiguity" regarding the balance Sauceda was offering to "write off" in his September 20, 2021, email. The county court noted Sauceda's testimony that any offer to waive the Papes' outstanding balance was with the assumption that the $14,900 had already been paid to Baltazar's Stone. The county court specifically found Sauceda's testimony on the issue to be "believable and persuasive." The county court observed that though the Papes may have interpreted Sauceda's email differently, the evidence showed that Sauceda never intended to waive the $14,900 which was charged back to the Papes' credit card. As such, there was no meeting of the minds, and therefore no accord and satisfaction.

The district court affirmed that no accord and satisfaction had occurred. Additionally, in the district court's recitation of facts, the court stated that Baltazar's Stone had run the Papes' credit card as agreed to by the parties. Though Pamela had initiated the chargebacks prior to Sauceda's September 20 email, the district court found that the chargebacks were not processed until October. On appeal, the Papes assert that the district court erred in making these factual findings.

We find no error in the county court's conclusion that no meeting of the minds occurred for the purposes of accord and satisfaction. There was some evidence that on September 14, 2021, Stromgren was aware that the Papes had requested chargebacks of the $9,900 and $5,000 transactions. Sauceda recalled receiving notice from the credit card company informing him of his ability to dispute the chargebacks but was unable to recall the date of the notice. However, Sauceda also testified that he had not been notified about any chargebacks at the time he had sent the September 20 email.

The county court determined that when Sauceda sent the September 20 email, he was unaware of the chargebacks requested by the Papes and believed he was writing off a small portion of the Papes' remaining account balance. The county court found Sauceda's testimony on the matter to be credible, and we decline to disturb that finding on appeal. Where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *Castillo v. Libert Land Holdings 4*, 316 Neb. 287, 4 N.W.3d 377 (2024). Sauceda's testimony is also supported by the subsequent email sent by Sauceda to Pamela after he received letters from the credit card company in October, requesting that the Papes pay the amounts over which she had initiated the chargebacks.

Though the Papes also contend that the district court erred in its factual findings regarding whether Baltazar's Stone was authorized to charge the Papes' credit card and whether the chargebacks had been processed prior to October 2021, these facts are not material to the question of whether Sauceda's concessions in his September 20 email were intended to satisfy the Papes' claim to the chargeback amounts.

We find that the county court's findings regarding accord and satisfaction conforms to law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. The district court did not err in so affirming.

(b) Waiver

The Papes also assert that the district court erred in affirming the county court's determination that the Papes did not plead waiver and that the evidence did not show Baltazar's Stone waived its claim to the chargeback amounts.

In the Papes amended answer and counterclaim, they pled:

[t]he Plaintiff and owner of the Real Property have reached an accord and satisfaction whereby all consideration for any materials and services supplied by Plaintiff to the owner of the said Real Property or Defendants has been exchanged, paid or otherwise transferred to Plaintiff and Plaintiff has affirmatively waived any other potential claim for any unpaid services or goods.

The Papes argue that the language "Plaintiff has affirmatively waived any other potential claim for any unpaid services or goods" constitutes pleading waiver. We disagree.

In reading the Papes' amended answer in full, it is clear that this sentence was part of Papes' pleading of accord and satisfaction, and that due to an accord and satisfaction taking place, Baltazar's Stone had waived any other claim for unpaid services or goods. The Papes' reference to waiver was a description of the effect of the affirmative defense of accord and satisfaction. Thus, the Papes have failed to show that they pled a separate affirmative defense of waiver.

Nevertheless, both the county and district courts went on to determine that even if the waiver could be considered properly pled, the evidence at trial did not support a finding of waiver.

A waiver is a voluntary and intentional relinquishment of a known right, privilege, or claim, and may be demonstrated by or inferred from a person's conduct. See *Eagle Partners v. Rook*, 301 Neb. 947, 921 N.W.2d 98 (2018). Ordinarily, to establish a waiver of a legal right, there must be a clear, unequivocal, and decisive act of a party showing such a purpose, or acts amounting to an

estoppel on his or her part. *Id*. A party may waive a written contract in whole or in part, either directly or inferentially. *Id*. A party may prove the waiver by (1) a party's express declarations manifesting the intent not to claim an advantage or (2) a party's neglecting and failing to act so as to induce the belief that it intended to waive. *Id*.

Assuming without deciding that the issue of Sauceda's waiver was properly before the county court, we nonetheless find that the evidence does not support the affirmative defense. The Papes argue that Sauceda was aware that the Papes had requested chargebacks of $14,900 at the time Sauceda sent his September 20, 2021, email waiving Baltazar's Stone's claim against the Papes. This argument fails for the same reasons as the Papes' defense of accord and satisfaction fails.

As stated above, Sauceda testified that he had only agreed to waive any outstanding balance because he believed the $14,900 had been applied to the Papes' account. At the time he sent the email on September 20, Sauceda was unaware that any chargebacks initiated by Pamela had occurred. The county court found Sauceda's testimony on the matter to be credible. Based on the county court's credibility finding and other supporting evidence, we find no error in the country court's conclusion that there was no clear, unequivocal, and decisive act of Baltazar's Stone showing it intended to waive any claim to the amounts which were charged back by the Papes. The district court did not err in so affirming.

## 2. REQUESTED CREDIT

### (a) Excess Stone

The Papes assert that the district court erred in affirming the county court's finding that the Papes had not been charged for excess materials delivered to their property.

The county court held that the Papes had failed to meet their burden of proof for their counterclaim regarding excess materials. The county court found that some excess material may have been delivered to the work site by Baltazar's Stone. The county court also found the testimony of Sauceda and his employees to be credible as to the amounts of material delivered to the work site and the amounts the Papes were billed for the materials. Because the county court heard no credible evidence that the Papes were billed for the excess material, the court found against the Papes as to that portion of their counterclaim. The district court affirmed the county court's order in its entirety, but did not make any specific findings as to whether the Papes had been charged for any excess materials.

On appeal, the Papes contend that the contractor's measurements demonstrate that only 1,790 square feet of stone was laid while Baltazar's Stone invoices demonstrate that over 2,400 square feet was delivered to the Papes' property. The Papes argue that the amount of leftover stone, as indicated by the contractor's measurements, is consistent with Pamela's testimony that there were four pallets of stone left on the work site. The Papes assert that the invoices evidence that Baltazar's Stone charged for all the stone it delivered.

The testimony at trial suggested that Baltazar's Stone had delivered an overage of material for the project, but that the Papes were not billed for the excess. Sauceda testified that he personally measured the Papes home and roughly 2,500 square feet of stone was delivered for the 2,300 square feet project. Sauceda and his employees testified that the amount of leftover stone was typical for an out-of-town project of its scale and that the Papes were only charged for the stone which was

installed. The county court specifically found this testimony to be credible and we decline to disturb that finding on appeal. Further, the invoices reflect that the Papes were billed for approximately 2,245 square feet of stone, not the 2,500 square feet that were delivered.

We find no error in the county court's finding that the Papes were not charged for excess materials. The district court did not err in so affirming.

(b) Mantel

The Papes assert that the district court erred in affirming the county court's failure to credit the Papes for the installation of the mantel in accordance with its finding that the Papes were entitled to the amount of $3,700.

The county court found that the installation and additional work by Sauceda on the mantel would not have been necessary if Baltazar's Stone had not disregarded the parties' agreement as to how the mantel would be prepared. The court noted that had the mantel been prepared correctly by Baltazar's Stone, it would have allowed Stanley to install the mantel himself. The county court also found that the Papes had not agreed to pay for the installation of the mantel.

In accordance with these findings, the county court determined that Baltazar's Stone had failed to show it was entitled to the costs associated with the mantel's installation as set out in the corresponding invoice.

| | |
|---|---|
| Angle Iron 3.5" x 5" | $550 |
| Anchors/Bolt Nut | $185 |
| Delivery - Out of Town | $425 |
| Labor – Interior – Mantel and Hearth | $1,150 |
| Labor – Angle Iron Installation | $350 |

The county court noted that the total of the line items was $2,660. The county court acknowledged that some of the charges included labor, delivery, or materials related to the hearth or to other items. However, no evidence was presented to allow the county court to break out any amount from these line items which would have been attributable to work other than hanging the mantel.

The county court concluded that the Papes were entitled to a reduction of the judgment against them in the amount of $2,600. In the county court's analysis of the Papes' counterclaim regarding the mantel, the court found that the "[Papes] are entitled to a reduction of the judgment against them by [Baltazar's Stone] in the amount of $3700.00. As noted above in this order, the . . . judgment has been reduced by this amount." The county court provided no detail regarding the $3,700 figure and ultimately reduced the Papes' judgement by $2,660.

The district court affirmed the findings of the county court regarding the mantel and the reduction of the judgment by $2,660. Though the Papes assigned that the county court's failure to reduce the judgment by $3,700 was in error, the district court did not address the $3,700 figure.

We disagree that the county court failed to properly credit the Papes for the installation of the mantel. The county court credited the Papes with the total costs associated with the mantel's installation as set out in the corresponding invoice. We acknowledge that the county court did at one point find that the Papes were entitled to a $3,700 judgment reduction. However, the county court also stated repeatedly in its order that the Papes were entitled to a judgment reduction of

$2,660. Additionally, the county court demonstrated that the total cost of the line items associated with the mantel's installation amount to $2,660.

The county court's reduction of the judgment by $2,660 was proper and the district court did not err in so affirming.

### (c) Hearth

The Papes assert that the district court erred in affirming the county court's finding that they failed to prove the value of the damage Baltazar's Stone caused to the hearthstone.

The county court found that the Papes had failed to meet their burden of proof as to any deficiencies in the material or installation of the hearth. The county court found that though the final appearance of the hearth may not have been exactly what the Papes had envisioned, the court did not find that it was a substantial deviation from what was agreed upon by the parties. The court noted that the Papes had not offered any evidence to suggest that the value of their residence had been reduced due to the appearance of the hearth, or evidence regarding the cost to repair or replace the hearth. The district court affirmed the county court's determinations regarding the hearth.

The photographs contained in the record on appeal appear to be black and white photocopies of the photographs entered into evidence at trial. It is therefore difficult for this court to appreciate any streaking or marks apparently left on the hearth. Nevertheless, the evidence demonstrated no deficiencies as to the material or installation of the hearth. At trial, Pamela testified that she was pleased with the design of the hearth, but not its finish. The contractor briefly testified that the application of a stain may correct the streaking, but no evidence was adduced as to the cost of any corrective measures necessary to achieve the aesthetic desired by the Papes.

The district court did not err in affirming the county court's finding that the Papes failed to meet their burden of proof as to any deficiencies regarding the hearth.

### (d) Additional Arguments

The Papes also argue that the district court erred in affirming the county court's total award of damages and failure to set off costs related to acid wash, undelivered sandstone, and scaffold charges. However, because these errors were not specifically assigned, we do not address them. To be considered by an appellate court, the party asserting an alleged error must both specifically assign and specifically argue it in the party's initial brief. *132 Ventures v. Active Spine Physical Therapy*, 318 Neb. 64, 13 N.W.3d 441 (2024).

### 3. PREJUDGMENT INTEREST

The Papes contend that the district court erred in affirming the county court's assessment of prejudgment interest when Baltazar's Stone attempted to impose usurious interest at the rate of 3.5 percent per month. The Papes argue that the parties contracted for an interest rate that was usurious and therefore Neb. Rev. Stat. § 45-105 (Reissue 2010) applied to prevent the award of any prejudgment interest. Though the Papes concede that they did not plead usury as an affirmative defense, they argue that the lower courts should have considered the defense as having been sufficiently pled as the issue of the interest rate was openly tried "with both parties offering evidence." Brief for appellant at 39.

Section 45-105 provides in part:

If a greater rate of interest than is allowed in section 45-101.03 shall be contracted for or received or reserved, the contract shall not on that account be void, but if in any action on such contract, proof be made that illegal interest has been directly or indirectly contracted for, or taken, or reserved, the plaintiff shall recover only the principal, without interest . . .

Neb. Rev. Stat. § 45-101.03 (Reissue 2010) allows interest, "which may be agreed upon" not exceeding 16 percent per annum.

In its complaint, Baltazar's Stone requested prejudgment interest "as allowed by law." The invoices sent by Baltazar's Stone to the Papes purported to charge an interest rate of 3.5 percent per month for any unpaid balance, which exceeds the interest allowed pursuant to § 45-101.03. At trial, there was testimony from Stromgren that Baltazar's Stone was actually seeking an interest rate of 1.33 percent per month and that the reduced interest rate was reflected in the documents showing the finance charges that had been applied to the Papes' overdue balance. The Papes did not set forth the defense of usury in either their answer or amended answer, nor did the Papes provide any evidence regarding the interest rate at trial.

The claim of usury in this state is an affirmative defense to a cause of action. *General Fiberglass Supply v. Roemer*, 256 Neb. 810, 594 N.W.2d 283 (1999). Usury must be pleaded to be available as a defense. *Id*. Since as long ago as 1927, the Nebraska Supreme Court has held that even if the facts appear from the plaintiff's petition to establish a usurious charge, it is still necessary for the defendant to at least claim the benefit of the usury defense. See *Stuart v. Durland*, 115 Neb. 211, 212 N.W. 31 (1927). In the present case, the Papes did not plead facts which would give rise to a usury defense; nor did the Papes claim the benefit of the usury statute. We agree with the county court that the Papes did not plead the affirmative defense of usury, and they are therefore precluded from utilizing usury as a defense and from the benefit of § 45-105.

Based on the evidence presented at trial, the county court found that Baltazar's Stone had failed to meet its burden of proof to establish that an agreement had been created between the parties for payment of any specific amount of interest on the unpaid balance of the Papes' account. Therefore, the court found that § 45-101.03 was likewise not applicable to the present case because an interest rate had not been agreed upon by the parties. Neb. Rev. Stat. § 45-104 (Reissue 2010) allows interest, "[u]nless otherwise agreed," at the rate of 12 percent per annum in specific circumstances, including "money due on any instrument in writing." This court has interpreted invoices and statements to constitute money due on an instrument in writing. See *Farm & Garden Ctr. v. Kennedy*, 26 Neb. App 576, 921 N.W.2d 615 (2018).

The Papes owe Baltazar's Stone damages in the amount of $14,640.85. We agree with the county court that this amount was not in legitimate dispute and as such, Baltazar's Stone was entitled to 12 percent interest on $14,640.85. The Papes assign no error to the county court's finding that the $14,640.85 was an "unpaid balance" as of September 14, 2021. There was a period of 1 year and 287 days from September 14 until the date of the county court's judgment, amounting to $3,137.82 in prejudgment interest.

The district court did not err in affirming the county court's award of $3,137.82 in prejudgment interest against the Papes.

## 4. ATTORNEY'S FEES

Finally, the Papes assert that the district court erred in affirming the county court's denial of attorney's fees. They argue that the county court incorrectly applied the law to their request for attorney's fees incurred while defending against Baltazar Stone's frivolous lien foreclosure action.

In the Papes' counterclaim, they requested that the county court award attorney fees under Neb. Rev. Stat. § 25-824 (Reissue 2016), due to Baltazar's Stone filing a construction lien against real estate that was owned by the Papes but was not the tract of real estate which contained their residence.

The county court found that the Papes were not entitled to attorney's fees as Neb. Rev. Stat. § 52-157 (Reissue 2021) of the Nebraska Construction Lien Act only authorizes attorney's fees if the claimant acts "in bad faith." The county court noted that Hajek's actions may have been negligent, but that his errors regarding the incorrect legal description of the Papes' property were not willful as he had been relying on the information provided by the Dawson County Register of Deeds and was unaware of his mistake at the time of filing. Because there was no evidence that Hajek, as a representative of Baltazar's Stone, had acted in bad faith in filing the construction lien, the county court determined that the Papes were not entitled to attorney's fees.

The district court affirmed the county court's denial of the Papes' request for attorney fees, but on different grounds. The district court found that the Papes sought an award of an attorney's fees due to litigation that occurred in a separate case. Thus, the district court concluded that the Papes should have sought the award of attorney's fees in the separate district court action involving the discharge of the construction lien and that this remedy was not available to Papes in the preset case.

The Papes argue on appeal that attorney's fees were appropriate under § 25-824, which allows a court to award reasonable attorney fees and court costs "against any attorney or party who has brought or defended a civil action that alleges a claim or defense which a court determines is frivolous or made in bad faith." A frivolous action is one in which a litigant asserts a legal position wholly without merit; that is, the position is without rational argument based on law and evidence to support the litigant's position. See *SID No. 596 v. THG Development*, 315 Neb. 926, 2 N.W.3d 602 (2024). The term "frivolous" connotes an improper motive or legal position so wholly without merit as to be ridiculous. *Id*. Any doubt about whether a legal position is frivolous or taken in bad faith should be resolved in favor of the one whose legal position is in question. *Id*.

Though the construction lien was filed in order to recover payment from the Papes for work provided by Baltazar's Stone (the basis of the present case), the issues relating to the construction lien were taken up in a separate action. Thus, our analysis as to whether Baltazar's Stone's legal positions are frivolous in this case does not include the erroneously filed construction lien. Resolving all doubts about Baltazar's legal positions in its favor, we find that Baltazar's claim for damages against the Papes due to nonpayment for services was not so unreasonable as to be deemed frivolous or taken in bad faith.

The county court did not err in denying attorney fees under § 25-824 and the district court did not err in so affirming.

## VI. CONCLUSION

Finding no error on the record, we affirm the district court's order affirming judgment in favor of Baltazar's Stone in the amount of $14,640.85.

AFFIRMED.